UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KELLY GROTKE, Ph.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:23-cv-10225-IT |
| | ) |
| HARVEST INVESTMENTS LTD., | ) |
| | ) |
| Defendant. | ) |

## ANSWER TO COMPLAINT

Defendant, Harvest Investments Ltd. ("Harvest"), by counsel, responds to Plaintiff Kelly Grotke's ("Plaintiff") Complaint as follows:

### INTRODUCTION

1. Plaintiff Kelly Grotke, Ph.D. ("Plaintiff") or "Dr. Grotke") was employed in Massachusetts by Defendants Harvest Investments Ltd. ("Defendants" or "Harvest") as its Director of Research for approximately five (5) years. Although Defendant in every way held out Dr. Grotke to be its employee, Harvest unlawfully classified Dr. Grotke as an "independent contractor," thereby depriving her of wages and benefits. Along the same vein, Harvest also failed to pay Dr. Grotke her complete wages within the time frames set forth in the Massachusetts Wage Act, G.L. c. 149, § 148. When Dr. Grotke complained to Harvest's head of Human Resources about being misclassified in 2020, Harvest illegally retaliated against Plaintiff therefor, without limitation, by withholding Dr. Grotke's earned wages, downgrading her duties, harming her professional reputation, reducing her hours (and therefore compensation) and, ultimately by terminating her employment, all in further violation of Massachusetts law.

1

**ANSWER:** Harvest denies the allegations in Paragraph 1.

## PARTIES

2. Plaintiff Kelly Grotke, Ph.D. is a natural person who resides in the Town of Essex, Essex County, Massachusetts, and who at all times relevant to this complaint worked for Harvest from her home in Massachusetts.

**ANSWER:** Harvest admits that Plaintiff is a natural person and that she performed services for Harvest from her home in Massachusetts. On information and belief, Harvest admits that Plaintiff resides in Essex, Essex County, Massachusetts. Harvest denies that Plaintiff worked from Massachusetts at "all times relevant to this complaint" and denies the remaining allegations in Paragraph 2.

3. Defendant Harvest Investments Ltd. is a corporation organized under the laws of Illinois with a principal place of business in Burr Ridge, Illinois.

**ANSWER:** Harvest admits the allegations in Paragraph 3.

## JURISDICTION, VENUE AND STATUTORY PREREQUISITES

4. This action arises under M.G.L. c. 149, §§ 148, 150.

**ANSWER:** Harvest admits that Plaintiff claims violations of M.G.L. c. 149, §§ 148, 150. Harvest denies violating M.G.L. c. 149, §§ 148, 150 or any other applicable law and denies that Plaintiff is entitled to damages.

5. This Court has original jurisdiction over this action, as it is a civil action in which more than $50,000 is in controversy.

**ANSWER:** Harvest does not dispute jurisdiction.

6. On December 16, 2022, Plaintiff filed a complaint against Defendant with the Massachusetts Attorney General's Office concerning the allegations herein.

**ANSWER:** Harvest admits the allegations in Paragraph 6.

7. On December 29, 2022, the Massachusetts Attorney General's Office issued a private right of action letter to Plaintiff.

**ANSWER:** On information and belief, Harvest admits the allegations in Paragraph 7.

8. Venue in the Business Litigation Session is proper, as the matter concerns complex wage-and-hour and contractual issues.

**ANSWER:** Harvest does not contest venue.

## FACTUAL BACKGROUND

9. Harvest holds itself out to be "a full-service pricing desk with over 30 years of experience providing prices and valuations for all types of financial instruments."

**ANSWER:** Harvest admits the allegations in Paragraph 9.

10. Harvest is one of the very few providers of unique pricing information to check management's figures within an audit and is highly respected in the finance world.

**ANSWER:** Harvest admits the allegations in Paragraph 10.

11. Harvest generates prices of securities, including in situations where there is little or no market data on the security – for example, because the security is not traded or is uniquely traded.

**ANSWER:** Harvest admits the allegations in Paragraph 11.

12. To do this work, Harvest uses a proprietary model for checking pricing information of securities for use by auditors in assessing management's valuation of a security.

**ANSWER:** Harvest admits the allegations in Paragraph 12.

13. Harvest also strives to maintain a profile that gave them access to regulatory bodies, including the Financial Accounting Standards Board ("FASB"), the International Valuation Standards Council ("IVSC"), and the Public Company Accounting Oversight Board ("PCAOB").

**ANSWER:** Harvest denies the allegations in Paragraph 13.

14. As Harvest's Director of Research, Dr. Grotke was for several years an integral and acknowledged part of Defendants' management team.

**ANSWER:** Harvest admits that Plaintiff was its Director of Research between approximately 2006 and 2009, but denies the remaining allegations in Paragraph 14.

15. Dr. Grotke holds a doctorate in History from Cornell University and has wide-ranging skills and experience as a writer, researcher and analyst.

**ANSWER:** On information and belief, Harvest admits that Plaintiff has a doctorate in history from Cornell University. Harvest admits that Plaintiff has experience as a writer, researcher, and analyst.

16. Harvest first hired Dr. Grotke in 2006 in the position of Researcher, initially on a part-time basis.

**ANSWER:** Harvest admits the allegations in Paragraph 16.

17. At the time, Plaintiff had nearly completed her Ph.D.

**ANSWER:** On information and belief, Harvest admits the allegations in Paragraph 17.

18. In 2007, Harvest promoted Dr. Grotke to Director of Research.

**ANSWER:** Harvest admits that it promoted Plaintiff to Director of Research in or around 2007.

19. In 2009, Dr. Grotke left Harvest on amicable terms and relocated abroad for a time.

**ANSWER:** Harvest admits the allegations in Paragraph 19.

20. After returning to the United States, Dr. Grotke reached out to Harvest's CEO Verne Scazzero ("Mr. Scazzero") in 2014 about rejoining Harvest.

**ANSWER:** Harvest admits the allegations in Paragraph 20.

21. Harvest rehired Dr. Grotke, and she again assumed the Director of Research position and title, with Mr. Scazzero's and Harvest's full knowledge, encouragement and support.

**ANSWER:** Harvest denies the allegations in Paragraph 21.

22. During the nearly six (6) years that followed, Mr. Scazzero and Harvest openly acknowledged Dr. Grotke as a part of Harvest's "management team," in communications with Dr. Grotke herself, with third parties, and among colleagues.

**ANSWER:** Harvest denies the allegations in Paragraph 22.

23. Dr. Grotke's title appeared on her LinkedIn profile, and she was given a Harvest e-mail address.

**ANSWER:** Harvest lacks knowledge or information sufficient to form a response to Plaintiff's allegations regarding her LinkedIn profile and therefore denies same. Harvest admits that Plaintiff was given access to a Harvest email address. Harvest denies the remaining allegations in Paragraph 23.

24. Dr. Grotke conducted qualitative research to investigate different types of securities, keep track of regularly [sic] environments, and to help Harvest develop new products. This was highly specialized work that was specific to Harvest.

**ANSWER:** Harvest denies the allegations in Paragraph 24.

25. Dr. Grotke was given access to Harvest's internal files and was given Harvest's research materials to use.

**ANSWER:** Harvest admits that Plaintiff was given limited access to some of Harvests internal files and research materials, but denies the remaining allegations in Paragraph 25.

26. Without limitation, Dr. Grotke's duties included drafting public comment letters on valuation issues and challenges for the for PCAOB, Securities and Exchange Commission ("SEC"), Financial Stability Oversight Commission ("FSOC"), IVSC, FASB, International Accounting Standards Board ("IASB"), and International Association of Certified Valuation Specialists ("IACVA"); researching broker/dealer rules, NAV methodologies, alternative investments and other securities types, national and international laws and regulations concerning valuation, audit/regulation and fraud detection; generating reports on issues related to regulatory climate, business model, and other informational needs; creating education modules for internal training and professional certification; and drafting international valuation guidance for Harvest's work with the IVSC.

**ANSWER:** Harvest denies the allegations in Paragraph 26.

27. Dr. Grotke's function as Director of Research was to advance Harvest's regulatory agenda, both from a regulatory and, to a lesser extent, from a client-facing standpoint.

**ANSWER:** Harvest denies the allegations in Paragraph 27.

28. This work required the delicate balancing of regulatory interest and the interest of Harvests' clients.

**ANSWER:** Harvest denies the allegations in Paragraph 28.

29. In short, Dr. Grotke's duties were wide-ranging and critical to Harvest's operation and success.

**ANSWER:** Harvest denies the allegations in Paragraph 29.

30. As Defendant was aware, Dr. Grotke's work for Harvest was performed almost entirely at her home in Massachusetts, with the exception of occasional travel on Harvest's behalf and a one-year period from 2015-2016 in which she lived in New York state.

**ANSWER:** Harvest admits that Plaintiff performed work remotely in Massachusetts and New York, but denies the remaining allegations in Paragraph 30.

31. Harvest paid Dr. Grotke paid $70 per hour, with no deductions for taxes and no benefits, and without any increase in compensation for several years.

**ANSWER:** Harvest admits the allegations in Paragraph 31.

32. At Defendants' [sic] instruction and/or with their authorization, Dr. Grotke invoiced Harvest twice monthly (rather than biweekly), and, unlike other Harvest employees, did not receive her compensation through Company payroll.

**ANSWER:** Harvest admits that Plaintiff sent invoices twice monthly and that Plaintiff did not receive her compensation through Harvest's employee payroll. Harvest denies the implication that Plaintiff was a Harvest employee at any time after 2009 and denies the remaining allegations in Paragraph 32.

33. In early 2020, Dr. Grotke learned about the Massachusetts Independent Contractor statute, G.L. c. 149, § 149B, and Dr. Grotke came to understand that Harvest had misclassified her and that she should be an employee, not a "contractor."

**ANSWER:**   Harvest lacks knowledge or information sufficient to form a response to Plaintiff's allegations regarding what she allegedly learned in 2020 and therefore denies same.  Harvest denies the remaining allegations in Paragraph 33.

34.   In or about May and June 2020, Dr. Grotke informed Rakayia Holmes ("Ms. Holmes"), Harvest's head of Human Resources, in multiple conversations that she believed that she (Dr. Grotke) had been misclassified and that, pursuant to Massachusetts law, she should be an employee.

**ANSWER:**   Harvest admits that in 2020, Plaintiff told Holmes that she believed she had been misclassified.  Harvest denies that Plaintiff was actually misclassified and denies the remaining allegations in Paragraph 34.

35.   Over the course of the summer of 2020, Harvest pivoted in what, in hindsight, was an obvious effort to cover up its misclassification of Dr. Grotke through a series of disingenuous, punitive actions that caused Dr. Grotke serious financial and emotional harm.

**ANSWER:**   Harvest denies the allegations in Paragraph 35.

36.   Harvest demanded, for the first time, that Dr. Grotke form a business in Massachusetts.

**ANSWER:**   Harvest denies the allegations in Paragraph 36.

37. Dr. Grotke did not understand why Ms. Holmes was demanding this of Dr. Grotke, as Dr. Grotke had never indicated any interest in starting a business and, indeed, had no client base or interest in forming one.

**ANSWER:** Harvest lacks knowledge or information sufficient to form a response to Plaintiff's allegations regarding her understanding and therefore denies same. Harvest denies the remaining allegations in Paragraph 37.

38. Indeed, the type of work that Dr. Grotke performed for Harvest could not readily be performed for other "clients"; without limitation, Dr. Grotke's work for Harvest was very unique to the Defendant and did not translate well to working for other companies.

**ANSWER:** Harvest denies the allegations in Paragraph 38.

39. In further retaliation for her complaint about being misclassified, Harvest also took steps to change and reduce Dr. Grotke's duties, effectively reducing her duties form the wide-ranging, high-level work discussed above to a training program that never came to fruition.

**ANSWER:** Harvest denies the allegations in Paragraph 39.

40. This was an attempt to move Dr. Grotke away from her work of several years and create the *appearance* that Dr. Grotke was merely an outside educator, rather than a misclassified, long-standing employee whose work had been essential to Harvest.

**ANSWER:** Harvest denies the allegations in Paragraph 40.

41. In other words, Harvest was attempting to conceal its violation of the Massachusetts Intendent Contractor Statute by re-defining Dr. Grotke's role and duties after the fact.

**ANSWER:** Harvest denies the allegations in Paragraph 41.

42. This revisionist history has been detrimental to Dr. Grotke's professional reputation and job prospects as it created the (false) impression that Dr. Grotke performed less-advanced, and very different, work for Harvest than she actually had.

**ANSWER:** Harvest denies the allegations in Paragraph 42.

43. During the summer of 2020, Dr. Grotke approached Ms. Holmes in the latter's capacity as head of human resources, and asked about a performance review and raise, since five years had passed without any increase in Dr. Grotke's compensation.

**ANSWER:** Harvest admits the allegations in Paragraph 43.

44. Ms. Holmes became antagonistic and insisted that "contract workers" do not get raises or performance reviews.

**ANSWER:** Harvest admits that independent contractors do not receive performance reviews. Harvest denies the remaining allegations in Paragraph 44.

45. Ms. Holmes pressured Dr. Grotke to either form a company or admit that she is one but Dr. Grotke repeated that she did not want to form a corporate entity for the purpose.

**ANSWER:** Harvest denies the allegations in Paragraph 45.

46. Dr. Grotke reiterated that she is part of Harvest's management team, that she has been treated as such for years, and that she had no interest in forming her own business.

**ANSWER:** Harvest admits that Plaintiff claimed to be a Harvest employee, but denies the remaining allegations in Paragraph 46.

47. Ms. Holmes informed Dr. Grotke that her title, "Director of Research," was unjustified and inaccurate because she was merely a contract worker.

**ANSWER:** Harvest denies the allegations in Paragraph 47.

48. This false statement belied Dr. Grotke's considerable and varied contributions to Harvest over several years.

**ANSWER:** Harvest denies the allegations in Paragraph 48.

49. This false statement also ignored that Harvest had long held out Dr. Grotke as having that title and role, and that Dr. Grotke had indeed functioned as such.

**ANSWER:** Harvest denies the allegations in Paragraph 49.

50. Between September 29 and November 2, 2020, Harvest unlawfully withheld more than $3,100 of Dr. Grotke's invoiced and earned compensation for more than a month.

**ANSWER:** Harvest denies the allegations in Paragraph 50.

51. Harvest also changed and reduced Dr. Grotke's duties and workload, attempting to re-label her work as "education," to Dr. Grotke's detriment.

**ANSWER:** Harvest denies the allegations in Paragraph 51.

52. Despite assurances that Dr. Grotke would blossom in her revised role and that such changes were merely a formality, Harvest drastically reduced Dr. Grotke's work and by late 2021 gave her none at all.

**ANSWER:** Harvest admits that Plaintiff's workload decreased as the functions she was contracted to perform reached completion, but denies the remaining allegations in Paragraph 52.

53. Effectively, Harvest had terminated Dr. Grotke's employment.

**ANSWER:** Harvest denies that Plaintiff was employed and denies the remaining allegations in Paragraph 53.

## PLAINTIFF'S CLAIMS

### COUNT I – VIOLATION OF THE WAGE ACT

54. Plaintiff hereby repeats and reavers the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Harvest reincorporates its answers to Paragraphs 1 through 53 as if fully set forth herein.

55. Plaintiff was an employee of Harvest, and as such Harvest was required to pay her complete and wages within the strict timeframe set forth in the Wage Act, G.L. c. 149, § 148 (i.e. weekly or biweekly, and within six (6) days after the end of a pay period).

**ANSWER:** Harvest denies the allegations in Paragraph 55.

56. Through the actions and omissions set forth herein, Defendants violated the Massachusetts Wage Act, G.L. c. 149, § 148, including without limitation by failing to pay Plaintiff's wages, including hourly pay, in a complete and timely manner.

**ANSWER:** Harvest denies the allegations in Paragraph 56.

### COUNT II – MISCLASSIFICATION AS AN INDEPENDENT CONTRACTOR
### (HARVEST INVESTMENTS)

57. Plaintiff hereby repeats and reavers the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Harvest reincorporates its answers to Paragraphs 1 through 56 as if fully set forth herein.

58. Since at least 2016, Harvest employed and treated Dr. Grotke as an independent contractor, including without limitation by failing to make proper withholdings from her pay and by denying her benefits afforded her properly classified co-workers.

**ANSWER:** Harvest denies the allegations in Paragraph 58.

59. Harvest is unable to meet its burden under Massachusetts law to show that its decision to classify Plaintiff as an independent contractor, rather than an employee, was lawful.

**ANSWER:** Harvest denies the allegations in Paragraph 59.

60. First, Plaintiff was not free from Defendants' control and direction in connection with the performance of her job for Harvest, either under her contract for employment or in fact.

**ANSWER:**   Harvest denies the allegations in Paragraph 60.

61.   To wit, and without limitation, Harvest gave Dr. Grotke her assignments and expected her to be responsive at the drop of a hat to meet Harvest's tight deadlines.

**ANSWER:**   Harvest denies the allegations in Paragraph 61.

62.   Second, Plaintiff's service was not performed outside the usual course of Harvest's business.

**ANSWER:**   Harvest denies the allegations in Paragraph 62.

63.   Here, Plaintiff's was an integral part of Harvest's business, without limitation because as she shaped Harvest's voice in public comment letters that she drafted in close collaboration with the company's leadership.

**ANSWER:**   Harvest denies the allegations in Paragraph 63.

64.   Third, and finally, Plaintiff was not customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

**ANSWER:**   Harvest denies the allegations in Paragraph 64.

65.   To wit, and without limitation, Plaintiff often worked near full-time hours for Harvest, had no established business doing the sort of work that she performed for Defendant and, indeed, had no other "clients" (nor did she consider Harvest a "client").

**ANSWER:** Harvest denies the allegations in Paragraph 65.

66. Defendant misclassified Plaintiff as an independent contractor when it should have classified her as an employee.

**ANSWER:** Harvest denies the allegations in Paragraph 66.

67. As a result of Defendant's actions, Plaintiff has suffered damages.

**ANSWER:** Harvest denies the allegations in Paragraph 67.

### COUNT III - RETALIATION

68. Plaintiff hereby repeats and reavers the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Harvest reincorporates its answers to Paragraphs 1 through 67 as if fully set forth herein.

69. Through the actions and omissions set forth herein, Defendants violated the Massachusetts Wage Act, G.L. c. 149, § 148B by retaliating against Plaintiff for her complaint about unpaid wages, up to and including by withholding earned wages, reducing Plaintiff's job duties, changing Plaintiff's job duties, and ultimately by terminating her employment.

**ANSWER:** Harvest denies the allegations in Paragraph 69.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kelly Grotke, Ph.D. requests that this Court enter the following relief:

(A) Entry of judgment in favor of Plaintiff on all counts;

(B) An award of damages for Plaintiff's (i) unpaid wages (including hourly wages and incentive compensation/commissions); (ii) damages arising from misclassification, including lost wages and benefits; (iii) lost wages and benefits arising from Plaintiff's unlawful termination, including without limitation, hourly wages, incentive compensation/commissions and benefits; (iv) damages for Plaintiff's emotional distress; (v) other consequential or economic damages; (vi) liquidated and/or treble damages; (vii) punitive damages; (viii) attorneys' fees; (ix) costs, and (x) statutory interest; and

(C) Such further relief as the Court deems meet and just.

**ANSWER:** Harvest denies that Plaintiff is entitled to any relief.

## JURY DEMAND

Plaintiff demands a TRIAL BY JURY on all claims so triable.

**ANSWER:** Harvest admits that Plaintiff demands a jury trial. Harvest objects to Plaintiff's demand for a jury trial to the extent Plaintiff asks that the jury determine equitable matters or otherwise decide issues not triable by a jury. Harvest reserves the right to have all equitable matters decided by the Court.

**AFFIRMATIVE DEFENSES**

1. Harvest had legitimate, nondiscriminatory and non-retaliatory reasons for its actions regarding Plaintiff.

2. Subject to a reasonable opportunity for investigation and discovery, some or all of Plaintiff's claims are barred by the doctrines of waiver, laches, estoppel, and/or unclean hands.

3. Subject to a reasonable opportunity for investigation and discovery, Plaintiff's remedies are limited by the doctrine of after-acquired evidence.

4. Subject to a reasonable opportunity for investigation and discovery, Plaintiff has failed to mitigate her damages, if any.

5. Subject to a reasonable opportunity for investigation and discovery, some or all of Plaintiff's claims are barred by the applicable statute of limitations.

6. Plaintiff has no right to damages because Harvest would have made the same decisions and taken the same actions absent any allegedly unlawful motivation.

7. To the extent Plaintiff seeks punitive, liquidated, and/or treble damages, her request is barred or limited by the FLSA, the U.S. Constitution, and the Massachusetts Constitution.

8. To the extent Plaintiff seeks punitive, liquidated, and/or treble damages, her request is barred by Harvest's good faith efforts to comply with all applicable laws.

9. Some or all of Plaintiff's requested relief may not be available, given the nature of Plaintiff's claims.

10. Plaintiff's claims must be offset by all overpayments and other job-related benefits paid or provided, including a reduction for compensation already paid for periods not compensable under the FLSA or state law.

11. At all times, Harvest acted with the good faith and reasonable belief that it was in compliance with the FLSA or state law and had reasonable grounds for believing it was in compliance with the FLSA or state law.

12. Any claims for unpaid wages and overtime based on Plaintiff's alleged misclassification are invalid because Plaintiff would have been exempt under the FLSA and/or state law if she had been an employee and would not have been eligible for such payments.

13. Any claim for overtime is invalid because Plaintiff has not alleged that she worked in excess of 40 hours in any week.

14. Plaintiff's claims for damages must be offset because Plaintiff earned more money as an independent contractor on a Form 1099 than she would have earned as an employee on a form W-2.

Dated: February 2, 2023

Respectfully submitted,

HARVEST INVESTMENTS LTD.

By: */s/ Matthew J. Baker*
Heather B. Repicky (BBO No. 663347)
Matthew J. Baker (BBO No. 698819)
BARNES & THORNBURG LLP
One Marina Park Dr., Suite 1530
Boston, MA 02210
(617) 316-5310
hrepicky@btlaw.com
mbaker@btlaw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true copy of the above document, filed through the ECF system, will be sent electronically to the registered participants of record as defined in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 2, 2023.

                                                   */s/ Matthew J. Baker*
                                                   Matthew J. Baker